16 So.2d 889

**AMERICAN NAT. LIFE INS. CO. v. SHADDINGER et al.**

No. 36709.

Jan. 3, 1944.
Rehearing Denied Feb. 7, 1944.

J. L. Warren Woodville, of New Orleans, for defendants and appellants.

R. A. Dowling, of New Orleans, for plaintiff and appellee.

O'NIELL, Chief Justice.

This is a contest over the proceeds of two life insurance policies amounting to $5,500. The beneficiary named in the policies, who is the widow of the insured, shot and killed him, and asserts that she did it in lawful self-defense. The heirs at law of the insured are his mother, three brothers and a sister. The insurance company, being warned by the heirs that they claimed the in-

surance, brought this interpleader proceeding against the widow and heirs of the insured, under the provisions of Act 123 of 1922, and deposited the $5,500 in the registry of the court. The claim of the heirs of the insured is founded upon a provision in the policies that, should there be no beneficiary, original or substituted, living at the time of the death of the insured, any payment under the policy would be made to the executors, administrators or assigns of the insured. The heirs of the insured invoke the law which is recognized by all of the courts, as a matter of public policy, that a beneficiary named in a life insurance policy is not entitled to the proceeds of the insurance if he or she feloniously kills the insured. 37 C.J. p. 576, sec. 341; 29 Am.Jur., Insurance, sec. 1310; New York Mut. L. Ins. Co. v. Armstrong, 117 U.S. 591, 6 S.Ct. 877, 29 L.Ed. 997; Prather v. Michigan Mut. L. Ins. Co., 19 Fed.Cas. page 1244, No. 11,368; Henry v. Knights and Daughters of Tabor, 156 Ark. 165, 246 S.W. 17; Metropolitan L. Ins. Co. v. Shane, 98 Ark. 132, 135 S.W. 836; Schreiner v. High Court I. C. O. of F., 35 Ill.App. 576; Kascoutas v. Federal L. Ins. Co., 189 Iowa 889, 179 N.W. 133; McDonald v. Mutual L. Ins. Co., 178 Iowa 863, 160 N.W. 289; Schmidt v. Northern Life Assoc., 112 Iowa 41, 83 N.W. 800, 51 L.R.A. 141, 84 Am.St. Rep. 323; Slocum v. Metropolitan L. Ins. Co., 245 Mass. 565, 139 N.E. 816, 27 A.L.R. 1517; Anderson v. L. Ins. Co. of Virginia 152 N.C. 1, 67 S.E. 53; Filmore v. Metropolitan L. Ins. Co., 82 Ohio St. 208, 92 N.E. 26, 28 L.R.A.,N.S., 675, 137 Am.St.Rep. 778; Equitable L. Assur. Soc. of United States v. Weightman, 61 Okl. 106, 160 P. 629, L.R.A.1917B, 1210; Robinson v. Metropolitan L. Ins. Co., 69 Pa.Super. 274; Green v. Metropolitan L. Ins. Co., 23 Pa. Dist. R. 574; Box v. Lanier, 2 Tenn.Ch. App. 1; Id., 112 Tenn. 393, 79 S.W. 1042, 64 L.R.A. 458; Murchison v. Murchison, Tex.Civ.App., 203 S.W. 423; Johnston v. Metropolitan L. Ins. Co., 85 W.Va. 70, 100 S.E. 865, 7 A.L.R. 823; Supreme Lodge, K. L. H. v. Menkhausen, 209 Ill. 277, 70 N.E. 567, 65 L.R.A. 508, 101 Am.St.Rep. 239; National Life Ins. Co. v. Hood's Adm'r, 264 Ky. 516, 94 S.W.2d 1022, citing R.C.L.; Sharpless v. Grand Lodge, A. O. U. W., 135 Minn. 35, 159 N.W. 1086, L.R.A.1917B, 670; Smith v. Todd, 155 S.C. 323, 152 S.E. 506, 70 A.L.R. 1529; Grand Lodge, U. B. F. v. Lawson, Tex.Civ.App., 203 S.W. 394, citing R.C.L.; New York L. Ins. Co. v. Davis, 96 Va. 737, 32 S.E. 475, 44 L.R.A. 305; State v. Phoenix Mut. L. Ins. Co., 114 W. Va. 109, 170 S.E. 909, 91 A.L.R. 1482.

The converse of the proposition is that the intentional killing by the beneficiary of the person insured, if committed in lawful self-defense, will not prevent the beneficiary from claiming the proceeds of the insurance on his life. 37 C.J. p. 576, sec. 341; 29 Am.Jur., Insurance, sec. 1310; Smith v. Todd, 155 S.C. 323, 152 S.E. 506, 70 A.L.R. 1529; Drown v. New Amsterdam Casualty Co., 175 Cal. 21, 165 P. 5; National Life & Accident Ins. Co. v. Turner, La.App., Parish of Orleans, 174 So. 646.

The widow of the insured, in her answer to the petition of the insurance company, merely admitted the averments that she was

the beneficiary named in the policies and that her husband died on the date stated in the petition; and she averred that she alone had the right to collect the insurance on his life. The heirs of the insured, in their answer to the petition of the insurance company, averred that the widow of the insured, being the beneficiary named in the policies, killed him wilfully and feloniously, for the purpose of enriching herself with his estate and particularly to collect the $5,500 of insurance on his life. The case was tried by a jury, the result being a verdict for the widow of the insured, as beneficiary under the policies. The presiding judge gave judgment accordingly. The heirs of the insured are appealing from the judgment.

The only question in the case is whether the homicide was committed feloniously or was justified under the law of self-defense. The killing occurred about 8:00 o'clock at night on the 28th of January in the kitchen at the home of the insured and his wife. She was there with her eleven-year-old daughter, a stepdaughter of her husband, when he came in, about 7:00 o'clock that evening. He was staggering drunk and very abusive. A sister of the wife had called upon her a short time before the husband arrived, but left soon afterwards. On his arrival he insisted upon her taking a drink of whiskey with him. She sipped a part of it and placed the glass in an adjoining room. He had a bottle of whiskey on the kitchen table and poured out a drink for himself and attempted to swallow it but his stomach revolted so that he went into the bathroom and vomited, and returned to the kitchen with the vomit on his shirt front. Immediately after his wife's sister left the house, according to the testimony of the wife, the husband began abusing and threatening her. She is the only surviving witness to what transpired after her sister left the house, because her daughter was in the bathroom, some distance from the kitchen, and heard only the climax of the tragedy. What she heard and saw is stated in her testimony thus: "Well, first I heard a crash, and heard mother scream, and then the shots, and I was not dressed; and so I just put on a robe that I had in the bathroom with me, and I went to the room and saw my father lying on the floor on his back and mother was bending over him. * * * She was bathing his face."

The wife testified that while her husband was abusing her he caught hold of her, choked her and twisted her arm, and that she in her struggles kicked him and broke away from him. He picked up an ice pick from the kitchen sink and said that he would kill her with it. She backed into an adjoining bedroom and picked up a revolver that he had left on the dresser. She pointed the pistol at him and told him that unless he would put down the ice pick immediately she would kill him. He defied her and continued cursing and threatening her but at the same time backed into the kitchen where he made the motion of replacing the ice pick on the sink, but immediately grasped it again and rushed toward her. She pulled the trigger five times in quick succession. Two of the shots missed him, one of them made only a scalp wound, the two others entered his body, causing death

almost instantly. He fell in a doorway, diagonally opposite the one from which his wife had re-entered the kitchen. She immediately rushed to him, bathed his face and attempted to revive him, but finding him lifeless she became hysterical. The daughter telephoned other members of the family. The police headquarters, the district attorney's office and the family physician were notified by one or another member of the family; and in a few minutes the house was full of them. Two hours later the coroner arrived and held an inquest. A police captain and the family physician, and another witness who arrived immediately after the killing and before the coroner took charge, testified that they saw the ice pick lying near the right hand of the dead man on the floor. Two assistant district attorneys attempted to interview the wife, but she was in such an hysterical condition that an interview was impossible. She was summoned to the district attorney's office and appeared there two days after the killing. After a full investigation by the district attorney he decided not to prefer charges against her. Thereafter the district attorney presented the case to the grand jury, and after making a thorough investigation the grand jury returned "Not a true bill".

There is no evidence to support the charge of the heirs of the deceased that his wife killed him not in self-defense, but wilfully and feloniously. It is argued for the appellants that the burden of proof, that the killing was done in self-defense, rested upon the one who admitted that she intentionally did the killing; and it is contended that there are enough inconsistencies in her narrative of the events immediately preceding and attending the killing to discredit her testimony so as to make it entirely unworthy of belief. We do not find the widow's narrative any more contradictory in its details than we would expect of any woman undertaking to describe a tragedy in which she and her husband were the principals. The attorney for the appellants lays great stress upon the statement in the testimony of the widow that when she picked up the pistol from the dresser in the bedroom and pointed it at her husband, telling him that she would shoot him if he did not put the ice pick down, *she backed him into the kitchen.* The inference of the appellants is that the husband was retreating when the wife shot him. But the fact is that when the husband advanced upon his wife with the ice pick in his hand and threatening to kill her, the bedroom into which she retreated and where she picked up the pistol had no other door but the one through which the husband was advancing. It was impossible therefore for the wife to retreat from the imminent danger to her life except through the door through which the husband was advancing until she pointed the pistol at him and, as she says, backed him into the kitchen. It was then that he made the motion to replace the ice pick on the kitchen sink and immediately grasped it again and rushed towards her.

In a prosecution for murder or manslaughter, self-defense is not a special plea, but is a part of the general issue tendered by the plea of not guilty; hence the burden of proof in the criminal trial is not on the

defendant to show that he or she acted in self-defense, but is on the State to prove, beyond a reasonable doubt, that the killing was done feloniously and therefore not in self-defense. State v. Ardoin, 128 La. 14, 54 So. 407, Ann.Cas.1912C, 45; State v. Varnado, 128 La. 883, 55 So. 562; State v. Herring, 131 La. 972, 60 So. 634; State v. Johnson, 149 La. 922, 90 So. 257; State v. Scarborough, 152 La. 669, 94 So. 204; State v. Vial, 153 La. 883, 96 So. 796; State v. Linden, 154 La. 65, 97 So. 299; State v. Conda, 156 La. 679, 101 So. 19; State v. Richardson, 175 La. 823, 144 So. 587.

We are not aware of any ruling in the jurisprudence of this state bearing directly upon the question, where lies the burden of proof as to whether the killing was done feloniously or in self-defense, in a civil suit in which the beneficiary named in a life insurance policy is claiming the proceeds of the insurance and admits that she killed the insured intentionally but asserts that she did it in lawful self-defense. The heirs of the insured invoke the common-law doctrine of confession and avoidance, and argue that since the beneficiary named in the policy admits that she intentionally killed the insured and asserts that she did it in lawful self-defense she must prove that the killing was done in lawful self-defense. On the other hand we have the provision in article 2291 of the Civil Code that a judicial confession cannot be divided against the litigant who makes it. Hence we doubt that the plea of innocence of the beneficiary of the insurance in this case can be converted by the heirs of the insured into a confession of guilt—or be so divided as to put upon the beneficiary the burden of proving her innocence. As a general rule the question as to where lies the burden of proof in a civil case is not decisive or even important when evidence has been introduced on either side or on both sides of the controversy. That is the condition in which we find this case. The only direct evidence on the question whether it was necessary for the wife to kill her husband to prevent him from killing her, or inflicting great bodily harm upon her, is the testimony of the widow herself, who swears that her life was in imminent danger when she fired the fatal shot. Her testimony is corroborated by that of her sister as to the condition of her husband immediately before the fatal difficulty. It is corroborated in some measure also by the testimony of the young daughter that she heard the crash in the kitchen, heard her mother scream, and then the shots. The testimony of the widow is corroborated also, to some extent, by that of the police captain, and by that of the family physician, and by that of another witness who arrived on the scene immediately after the killing, and who testified that they saw the upset condition of the furniture in the kitchen, the broken glass front of the china closet, and the ice pick near the right hand of the dead man lying on the floor.

The fact that the district attorney's office after an investigation of the case, and that the grand jury after a further investigation, and that the jury in this case, concluded, unanimously, that the killing of the insured was done in lawful self-defense, makes the case one that would require

stronger evidence than we have here to justify a reversal of the jury's verdict.

The insured was a victim of the habit of drinking intoxicants to excess, periodically. On the occasions when he was thoroughly under the influence of liquor he was irresponsible. He had been drinking to excess for nearly a month at the time of the tragedy. When he was not under the influence of liquor he was an exemplary citizen, and was kind and generous to his wife and devoted to his mother. We have not only their word but the most convincing proof of that. "O God, that men should put an enemy in their mouths to steal away their brains!"

The judgment is affirmed.